Good morning, Your Honors. Good morning. Your Honors, it is my intention to focus this morning on two principal issues. First, at the guilt phase, the Doyle error. Secondly, with regard to the penalty phase, the issue of the failure to investigate and present mitigating evidence. Mr. Gerstein, it probably would be good if you would just state your full name for the record. Oh, sorry, Your Honor. Yes, Robert Gerstein for appellant petitioner Ricky Earp. Thank you, Your Honor. As to Doyle error, Your Honors, because this is a case in which there was no physical or other decisive evidence of guilt, it appears that the only means by which the prosecutor felt he could remove the reasonable doubt created by what the California Supreme Court described as the plausible alternative version of the facts presented by Mr. Earp was to destroy his credibility. And the entire prosecution case was aimed at accomplishing that. Essential to that effort was repeated and calculated comment. It directed at leading the jury to draw an inference of guilt from Mr. Earp's host Miranda silence during the three years of his pretrial incarceration. Emblematic of that repeated effort was this statement in argument. When you are innocent and there are somebody that knows you were innocent, that is the person you front at every opportunity. The defendant doesn't front Mr. Morgan for three years because he doesn't need a witness. He was innocent. Mr. Gerstein. Yes, Your Honor. The problem I'm having with the argument is that Mr. Earp testified. And it seems to me that under the Supreme Court cases, there's a difference in the use of post-Miranda statements by the defendant for impeachment purposes. And if it's true that he had conversations for a period of time with friends and family members while he was incarcerated, you're not suggesting it's inappropriate for the prosecutor to ask questions that are designed to impeach him based upon things that he might have said to those family members, are you? No, Your Honor. There was one instance actually on the record of a communication to a friend and family members to Virginia, his girlfriend. And he held up the sign in the jail saying there's somebody else present in the room. Yes, Your Honor. And that's the only instance of any such communication. And you're not saying that it's improper for the prosecutor to question with regard to that incident in particular that he did start to talk about what had happened on the night of the day of the murder? No, Your Honor. He, for purposes of warning her that she should have reason to leave the area, Your Honor, he held up that sign that apparently said something. That would mean the area were being monitored, so, you know, I can't talk about that. Wasn't that the purpose of writing it down? Yes, Your Honor. Yes. The purpose of writing it down was to try to avoid the monitoring that he was aware was taking place so that he couldn't couldn't really speak about this matter. And as he said, after he held up that sign, he was told not to communicate anything further to anyone except his attorneys. And he said he did. So now there are cases with regard to this business of opening the door, talking about something like this in this in this circuit. We have Ochoa Sanchez. So there are other cases from other circuits that that were not briefed because this issue was not really briefed fully by by respondent. But but we could present them in further briefing. But in any case, what they show is this, that you can indeed prosecution can indeed ask questions about the specific communication. But that can never be a basis for actually then drawing, as the cases say, drawing meaning from silence. It is never acceptable and it's never proper on this kind of impeachment to say what the prosecution repeatedly said here, which was if you because he was not because he was silent after the Miranda warnings, because he did not speak for three years about his defense. He is therefore guilty. And that's what the prosecutor did, Your Honor, here repeatedly. That is a difficulty with the argument, at least from a fraction of the court. The record shows affirmatively that the baby was there, doesn't it? The record shows that the baby was there. Yes. And it shows affirmatively, affirmatively that your client was there. Yes. Who else was there on this record? We have the testimony. No. Who else was there without testimony on this record? Nobody is the answer to that question, isn't that so? The only way somebody else was there. Is it one of the two people who were there? Put some there. Well, the baby can't. So your client was the only person who could put an extra person there. Now, is that the state of the record? If it's not, you point it out. Well, Your Honor, when you say puts another person there. Indeed, he was the only person who could testify that there was another person there if there was another person. And that's that's that's all right. That's absolutely absolutely. Thank you. But wasn't there testimony by a neighbor that they saw someone leaving the house? Yes, Your Honor. All right. That suggests that somebody else. There was. That's absolutely right, Your Honor. Thank you. There was indeed corroboration. There was the testimony of a neighbor who said that she saw somebody leaving the house before she heard the sirens and saw the fire truck. That's not inconsistent with my statement. My statement to you was we know two people were there to put someone else there requires testimony. It does require testimony. But the testimony of the neighbor actually supports. The contention that a third person was there because it says that before she heard that siren and before she saw that fire truck coming, someone came out of that house. That person could not have been Mr. Because we know that Mr. Earp stayed in the house and was there at the time that the fireman came to take care of him. Or is it just an unknown male? Yes, Your Honor. She just said that it was a an unknown male. I believe a young man mentions, I believe, something about a shirt. I don't quite recall the details, but it was not that Mr. Earp left the house at that time. It was that some man hurried out of the house at that time. And that, in fact, is another person providing testimony, establishing that there was another person. There was a third person present. Is that an inference that the jury was asked to make? The problem was the reference that I read to the neighbor. It's pretty ambiguous testimony. It could be, I suppose, consistent with her having seen your client leave at some point. I mean, maybe he went ran out of that. He'd been outside. Correct. According to his testimony. Yes. You're cleaning paintbrushes. Yes. I'm I'm not sure how much we can draw when you say corroborate in light of the jury's verdict. I'm not sure that that's the way the jury saw it. Well, the jury was apparently uncertain enough, Your Honor, to deliberate for five days. And they did ask for the testimony of this neighbor. Now, there were there were three neighbors who testified. And one of them did say that she saw Mr. Earp leaving. Apparently at a later time, there were these two women who said they saw someone else run out of the house before the fire truck came. And before they heard this iron. And that seems to be a different departure. So there there does seem to be that that testimony. But again, my question was, was the testimony specific enough that we could rule out Mr. Earp as the person that they saw? In other words, the description didn't match. Or is it just an unknown male subject was seen at some point leaving the house? Your Honor, I think the basis for ruling out Mr. Earp was that we know that Mr. Earp did not. And we're not talking about going into the backyard. We're talking about actually leaving the house and going away from the house. I understand that. But he simply couldn't have done it and still have been there when they say a very short time afterwards. The man left and came back and they just didn't see him return. I mean, the problem I'm having is with the ambiguity of the of the quote unquote eyewitness identification testimony. It really isn't identification testimony. It could be consistent with your client's version. It could also be consistent with the prosecution's version. And that's what the jury had. Well, Your Honor, it is. There is some ambiguity there. The question that we are looking at here is was Mr. Earp's account sufficiently plausible so that we can say that the very substantial Doyle error we find on the record was prejudicial. That's really the issue. Why was it prejudicial? Why was the state's determination that Doyle error was harmless? Why was that an unreasonable application of Supreme Court law? Well, Your Honor, as to the second question first, because it really comes first in the analysis, it was unreasonable because in the California Supreme Court's analysis, the major part of the Doyle error just disappeared. It was not there. It was not dealt with. And when you have a situation such as that in which a court simply does not address a substantial part of the facts or a substantial part of the claim, that is unreasonable. That's what the United States Supreme Court said in Williams versus Taylor. This circuit has said that in Taylor versus Maddox, in which Judge Kaczynski said, ignoring a crucial evidence compels the conclusion that the state court decisions were based on unreasonable determination of the facts. Well, I'm sorry. Even supposing the state court unreasonably applied Chapman to the alleged Doyle error. Yes, Your Honor. Why would there be prejudice under Bricht? Your Honor, there would be prejudice under Bricht because there was no, once again, there was no decisive evidence against Mr. Earp. The California Supreme Court itself said that Mr. Morgan could plausibly have done this crime if the jury had evidence that this was plausible. If the jury deliberated for five days, then it is difficult to see how we can be reasonably assured that this very substantial, repeated Doyle error did not impact the jury substantially. Well, I mean, we frequently hear the argument made that we should somehow read into a jury's length of time in deliberating the conclusion that the case was a close one. Well, the problem I have with it is we don't know what it was that caused the jury to hang up, if that's in fact what they were doing. It could have been the fact that they're contemplating what they know to be a crime that's punishable by death, and they want to be very careful in going through the evidence to make sure, before they reach their unanimous verdict, that they're in agreement. And beyond that, I'm not sure how much more we can read into it. Fine, Your Honor. It's a supportive point. It's not the central point. Well, let me get back to a point that I think you were making earlier and ask you, in regard to a charge of recent fabrication, which is essentially the purpose of the prosecutor's cross-examination, you're not suggesting, are you, that the prosecution is unable to cross-examine Mr. Earp in a manner that is designed to suggest to the jury that he's just making this up because now he's on the witness stand testifying in his defense, and he's got to lay it off on somebody because, as Judge Ferris was indicating, the problem that we have is that there's no doubt that he was there at or about the time that the crime was committed. So he's going to have to explain to the jury that they've got to believe that somebody else was responsible. No, certainly, Your Honor. The contention here is that the prosecutor cannot do that by telling the jury to draw the implication of guilt from post-Miranda silence, and that's exactly what the prosecutor did here repeatedly, and that's what we're focusing on. If you're saying that it is permissible to cross-examine on a theory of recent fabrication, then how else does the trial lawyer do it without suggesting that you made it up? And the reason we know you made it up is that this is the first time that there's been any suggestion that there was somebody else there. Well, Your Honor, one way to do it is another thing that the prosecutor did, which was talk about the fact that Earp did not discuss his defense in the three days between the occurrence of the injury and the time he surrendered himself. Now, that was legitimate. But that's different from saying, why didn't you present your defense during the three years in which you were in pretrial detention? That is clearly, that is clearly Doyle error. That's clearly wrong. And it makes a big difference whether you can talk about, as this prosecutor did, there's a big difference. You can talk about what he might or might not have said in a hectic three-day period in which he was in a panic because he was afraid of being arrested as a parole violator, in which he believed that taking his story to be true now, as it plausibly could be, he believed that this was an accidental matter. He was reluctant to put forward Morgan because he was beholden to Morgan and he was in fear of Morgan. All of those factors came into that three-day period. Now, that's a highly debatable issue. You know, the problem is I listened to your argument and you've read the record probably more times than anybody. But he had reasons and explanations for what happened to the baby. It isn't this question of silence. He gave explanations for what happened to the baby. Yes, Your Honor. And he gave more than one explanation of what happened to the baby. Now, did you find that? Well, he gave some explanations. But isn't silence, that's the only point I'm asking you. Is it silence or is it the fact that he now has an explanation inconsistent with the prior explanations that he has given? Your Honor, he said a number of different things to people in that brief three-day period when he was, he had all these concerns. And he was really quite panicked about being arrested, about what happened to the baby and so on. And clearly wasn't quite sure what to do there. In fact, he wondered if you could tell that a baby had been raped by looking at it. Yes. There was testimony to that effect. And that was after he had been called. He said he didn't recall it, Your Honor. But but but it was after he had been called by his girlfriend, Virginia, who said that the police were checking for sexual abuse. Now, he later later testified that his concern was to ensure that, in fact, they could check and find that there was no sexual abuse because he said as far as he was concerned, it had been accidental and he couldn't imagine how there could be. So he said, well, that'll clear me. The critical distinction here is between talking about that period and talking about the period after he received his Miranda warnings. So Miranda is, as far as you're concerned, Miranda is the cutoff. Everything before the invocation or excuse me, the admonition of the Miranda warnings is fair game. Yes, Your Honor. And that so the prosecutor could say, look, during that three day period, you never suggested to anybody that the version you testified about at the trial is what happened. Certainly. But you want to move on to I think we have your Doyle point. Do you want to move on to to the ineffective? Yes. Thank you. Thank you. The principle intention we have with regard to ineffective assistance is that at the penalty phase. Counsel failed effectively and sufficiently to investigate and present mitigating evidence with regard to Mr. Earp's background and history. Specifically, specifically that kind of evidence that she should have discovered other than the cumulative evidence already put. She put into the record. Yes, Your Honor. Well, she she had before her or at least she had available to her school records that showed that there were some serious problems of mental and psychological nature. She was somewhat aware that there had been some previous drug use. She was apparently aware that there was a head injury. She did not follow up on any of these matters. She made no further investigation with regard to the drug use. In fact, it would have shown that starting in the eighth grade, Mr. Earp was using not only marijuana, but meth, cocaine and LSD. She did not, as she says in her declaration, she did not go to a neuropsychologist to investigate the question of what the head injury might have done. What the what the drug use, early drug use might have done. Now, we now have in the record a declaration by an expert in this field which says that the discrepancies and the problems that show up in the school records, and particularly the wide gap between verbal and and performance on the IQ test are indicative of some brain damage. And that that brain damage can be attributed to the head injury that he had when he was eight years old. And that could have been used to show that his judgment and his capacity to regulate his behavior was impaired. Do you have any Supreme Court cases to bolster your argument that that evidence should have been presented? Well, Your Honor, yes. Certainly Wiggins talks. Wiggins v. Smith. Wiggins v. Smith talks extensively about this point, and not just, Your Honor, if I may, that it should have been submitted, but basically that it should have been investigated, that the leads should have been followed up, that there was not sufficient investigation here of the potential pool of mitigating evidence. Would that have been consistent with his his version of how the how the injury and death occurred? Well, had she done that? Not necessarily. No, not necessarily, Your Honor. But again, very inconsistent with it. Yes. Well, yes and no. Your Honor.  First of all, Wiggins makes the point that even in Wiggins, the argument that was made at the penalty phase was a lingering doubt argument. Yet the Wiggins court said that there was ineffective assistance of counsel, and it was prejudicial because counsel failed to do the investigation that would have justified a reasonable conclusion that you should have taken the lingering doubt route rather than another route. Secondly, as is pointed out in the expert declaration here, this evidence could have been used to bolster lingering doubt because we were talking here about why it is that Mr. Earp acted the way he did if he was innocent, why he said what he did, didn't say what he did, acted the way he did after the injury. And that could be accounted for by this evidence. Yes, Your Honor. Why doesn't the suggestion that you just made violate the command of the Supreme Court that we don't look at these cases in hindsight? We know that the defense that he pursued was not an adequate defense because the jury rejected it. You've now articulated on the basis of the evidence that was apparently not known to his defense lawyer a better defense than the one she considered. How do we avoid what the Supreme Court says we have to avoid, which is the 20-20 hindsight application in determining whether the California's court's determination was objectively unreasonable? Well, Your Honor, I think the critical point once again is that we have to focus on the failure to investigate, the failure to follow up. She wasn't capable of making a rational, solidly based judgment about what kind of defense to put forward at penalty phase. What the Supreme Court doesn't tell us in Wiggins is how much investigation. She did put on evidence through family members and so on of his childhood history and school and upbringing and so on. And where I'm having a problem with Wiggins is trying to figure out where the defense lawyer can satisfactorily end the investigation and say, look, as Judge Ferris suggested with his question, this evidence does not support the defense strategy and theory that I am pursuing. I'm not going to pursue it any further. It's not leading to the discovery of otherwise helpful evidence to the defense that I want to pursue. Well, once again, Your Honor, the evidence that she had before her cried out, as the attorney expert stated in the record, cried out for further development. You the answer certainly has to be that your first follow up on the leads, that you look at the discrepancies that arise and the problematic contentions that arise in the school records. And you go from there and you say, what do these mean and how can they be used? Could they be used to support either one defense or the other? Which defense should I use? She cannot say that she did an adequate job without having gone through that process. Also, we're talking about time of sentencing now, are we not? Yes, Your Honor. We're not talking about time of trial. Absolutely. Once he was convicted, the question is, what should she have put before the judge with respect to the sentence? Isn't that the real question? That's absolutely right, Your Honor. Thank you. I will do no further questions at this time. I'll give you a little extra time because this is obviously an important point. Yes. I'd like, if you would, to address an issue that you've obviously briefed. Judge Reel held a hearing on the ineffective assistance issue and limited it to whether or not the personal relationship that counsel had with Mr. Earp amounted to an actual conflict of interest. If you could address whether or not that is sufficient under the Supreme Court case law for a Ninth Circuit case law, or whether we need to remand for a further evidentiary hearing. Well, we do need a remand for a further evidentiary hearing, I believe, on that issue, Your Honor. But let me just make one point. There was not an evidentiary hearing with regard to ineffective assistance. There was a grant of summary judgment on ineffective assistance. There was an evidentiary hearing with regard to conflict of interest. I'm sorry. I misspoke. And the question is, you challenged the bifurcation of the actual conflict versus the prejudice. And what's wrong with the way that Judge Reel did it? And once he'd concluded that there was no actual conflict, isn't that the end of the inquiry? And if not, why not? Well, the question is, how do you prove actual conflict? And the Supreme Court has now said in Mickens that you prove actual conflict by showing that some kind of a relationship, some kind of dual representation, something has an actual impact on representation. It was when the effort was made to try to get to that issue that Judge Reel consistently said, no, I'm not going to let you get into that. Now, that was contrary to clearly established law, which says that in order to prove whether there is a natural conflict or not, you've got to be able to look at the effect. That was the problem. And that's why that was such a truncated hearing, which did not get to the question of actual conflict. I'll reserve the last minute of my time. Kagan. Yes. Thank you. And that's the failure to hold an evidentiary hearing in the question of witness intimidation. Now, on the basis of Taylor's affidavits, could the district court determine that he was not worthy of belief because he appeared to be willing to recant his prior statements whenever it benefited him? Why should he have held an evidentiary hearing here? He should have, Your Honor, held an evidentiary hearing because no evidentiary hearing was ever held. The trial court judge at the state level simply decided without seeing the witness that the witness was not credible. And then that was that determination was accepted by the district court judge. Surely there does need to be an evidentiary hearing on that question, because a tolerable case certainly was made that there was witness intimidation there, Your Honor. All right. All right. Mr. Kirsten, we'll let you have some rebuttal time. Thank you. We'll now hear from Mr. Bilderbach. Good morning, Your Honor. Deputy Attorney General Bill Bilderbach. Beginning with the last point raised involving the witness intimidation question, the reason that we didn't have a hearing and the reason we can't have a hearing and no hearing would be appropriate on that issue in this case is twofold. One is the court can't hold a hearing unless, as alleged, there is a basis for concluding that under ADPA the California Supreme Court unreasonably applied or came to a decision that was contrary to some United States Supreme Court case. Here the district court could not come to that decision, even assuming all of the allegations in the petition are true. The second reason is, and this is sort of a more peculiar reason having to do with the status of this case, Michael Taylor's declaration, Michael Taylor's testimony itself was hearsay, which would fall under no cognizable exception. There's no basis for receiving the evidence on the question. And this is the tremendous problem. Even if we were to credit Michael Taylor's allegations that the prosecutor intimidated him into recanting some testimony, at the end of the day Michael Taylor cannot stand up in court and say the things that he can't stand up in federal court in any event and say the things that are contained in his declaration. We can't receive that evidence in this forum. And California and the California trial court's determination that that evidence was inherently incredible is utterly consistent with that. The problem with the hearsay. My problem was that the credibility determination was made on the basis of affidavits only. That's correct, Your Honor. Is that appropriate for the district court to make a credibility assessment on the basis of affidavits? Well, the question, I think, again, viewing this through the lens of EDPA, the question in the first instance was for the district court in any event and then was whether or not the trial court, the California trial court's determination on the question of credibility was appropriate. And in this case California law is perfectly clear that when ruling on a new trial motion, a California trial court judge is allowed to judge the credibility of a bare affidavit in determining whether or not the proffered newly discovered evidence is sufficient, creates a sufficient basis upon which to order a new trial. Here the trial court judge came. I'm sorry, Your Honor. That's all right. I understand your position. Okay. Don't use any more of your time. Sure. Thank you, Your Honor. Moving back one now to the question of ineffective assistance of counsel. The issue of whether or not trial counsel was deficient in failing to discover penalty phase mitigation evidence fails on a couple of levels. And will you say why this case isn't controlled by Wiggins? Well, of course this case is controlled by Wiggins, Your Honor. But I would say that trial counsel's actions in this case complied with Wiggins. In this case, for example, the neuropsychological testimony or evidence or the declaration from a neuropsychologist that's being proffered by a petitioner in this case contains no evidence. It is that it contains a series of double negatives, which they're trying to say create some basis for an evidentiary finding, that there are things in petitioner's past that are not inconsistent with brain damage of some kind, that there are things in the defendant's past that are not inconsistent with mental health problems. There is no and never has been any evidence presented either in the petition or in the supplemental matters leading up to the evidentiary hearing and summary judgment motions that affirmatively states that this petitioner has mental problems, this petitioner has a neuropsychological impairment of some kind. Isn't that because there was no evidentiary hearing? No, Your Honor. They have to allege it in the first instance. They can't simply say, we don't know whether or not there's a neuropsychological problem. That creates a conundrum which this Court has to sort out. Doesn't that go to ineffective assistance of counsel in this case? No, Your Honor. I'm saying that in order for them to maintain a claim of ineffective assistance of counsel in this Court, they have to prove, among other things, that trial counsel's failures somehow prejudiced the defendant. And in order to do that, they have to come forward now and say, here's what would have been uncovered if trial counsel had done the things trial counsel was supposed to do. And that's why the recent United States Supreme Court case that I'm going to butcher the pronunciation of, I think it's Romapilla, but whatever the pronunciation of that recent case is, is extremely instructive. Because in that case, what the United States Supreme Court told us was that trial counsel should have done a thing. And if trial counsel had done that thing, here's what would have been uncovered. And if that stuff that had been uncovered had been presented, here's how it would have been helpful to the jury. We're missing two important points in the petition in this case. They do not say, they only say trial counsel should have done more. They do not and have not to this day ever identified a single witness who should have been called but was not. They have not identified a single question that should have been asked of any witness but was not. And they have not identified a single piece of paper, a single piece of documentary evidence, that should have been presented to the trier of fact at the penalty phase that was not presented. In the absence of some allegation that there is something out there that should have been presented that was not, other than these sort of very vague notions that they should have done a better job, that if she had done a better job, it might have been helpful, it's impossible for the district court, it was impossible for California, and I would submit it's impossible for this Court to conclude the trial counsel was ineffective. I thought they proffered the school records and psychological tests, IQ tests and so forth, had they been presented would have made a difference in terms of the jury. The jury may still have found there wasn't enough, but they didn't have the opportunity. And those kinds of things were not presented to the jury. Those were not presented to the jury, Your Honor. There's two problems with the allegation resting on those. One is, as Mr. Gerstein conceded, the evidence suggests that trial counsel in fact had those matters, had the school records in front of her.  Where is that in the record? If you'll review Ms. Dell's declaration, she says very specifically that she has, she had access to Petitioner's school records. It's no more specific than that, but she does say that. Further, there is certainly, and again, to this point, we have been presented with no evidentiary basis for presentation of just unadorned evidence, here's his report card from the sixth grade, that that's permissible, it's hearsay, there's been no showing that it fulfills any cognizable hearsay exception. Well, it may or may not be hearsay. Well, just so, Your Honor. But at this point, they would be submitting it, I submit to this Court, they would be submitting it for the purpose of bringing the truth of the matters in the out-of-court communication to the attention of the jury. And unless and until they make a sufficient allegation, which they have never done, that this could be presented to the trier of fact as perhaps an exception to the hearsay, or I don't suppose it's non-hearsay, I don't think that would work in any event. But it's some exception to the hearsay rule. It could be some business records exceptions, et cetera, and medical records. It certainly could be. But even as it may, you said there'd been no allegation made by opposing counsel of what might have been shown. And then you say, well, she had those records, but she didn't present them in mitigation. Is that my understanding? Well, there's two points. I don't want to overstate the certainty with which I'm speaking on the school records issue, Your Honor. All Ms. Dell says is she had access to school records. There's never been any discussion. There certainly has never been any allegation clarifying the extent to which that contemplates some or all. I would find it unlikely, frankly, that Ms. Dell had reviewed every school record of Mr. Earp, even every school record that they've managed to uncover in the last 15 years or so regarding Mr. Earp. So it's entirely possible she only had a picture of them. It's also entirely possible that as a preliminary review of the school records reveals that Mr. Earp is a person of above-average intelligence who, while he had trouble in school and smoked pot and tried some other drugs when he was a teenager, that, as Judge Tallman was suggesting, that a reasonable trial lawyer might conclude that there's really no reason to pursue that with any particular vigor, particularly because, as consistent with what Judge Ferris was saying, this is utterly inconsistent with this notion that he had nothing to do with the injuries to the child. Further, in any of your ---- We're talking about sentencing now. We're not talking about whether he committed the crime. Absolutely, Your Honor. And in that vein, we have to keep in mind the unbelievable savagery of the crime in this case. This is the worst crime. It is a crime. But the question now is, he's been convicted. What is he entitled? I mean, we even have a Ninth Circuit case that talks about this, a fairly recent case, Boyd v. Brown. I believe my colleague Judge Ferris was on that panel, written by Judge Kaczynski, again talking about the necessity to have a hearing on mitigating circumstances. And I'm trying to figure out why we shouldn't have. I mean, we're not talking about a 10-month trial. We're talking about a hearing on the mitigation evidence and why we shouldn't have one. Well, because in this case, in the trial court, there was a substantial case in mitigation. This is not a case in which there was a de minimis or a lacking case in mitigation presented by petitioner or by petitioner's counsel. This is a case in which there was a substantial case in mitigation. And I would direct the Court to the declarations attached to the petition, which in large part were from people who in fact testified in this case at the penalty phase in favor of petitioner. It's very difficult to come to the conclusion that people who did testify, there was some failure to either investigate or present evidence as to those people who actually did testify. And also, I don't think that we can quickly dismiss the extraordinary case in aggravation in this case, unless and until we can safely conclude, comfortably conclude, that petitioner is likely to receive a more favorable determination in the absence of the purported failings. There's no reason to further examine the question of whether or not trial counsel could have done more. But how can we decide that if we don't know what the evidence is? It's kind of circular reasoning. That's why I asked Mr. Gerstein the question in reading, trying to make sense out of Wiggins and figure out what the Supreme Court was telling us. How much is enough? When do we know that the defense lawyer can comfortably say, with regard to mitigation evidence, this isn't leading me to anything helpful and it's not going to help my client get a lesser punishment? Well, I see two questions, and maybe I'm at cross purposes with the Court, so let me be clear. One of the issues I think the Court is asking me about is whether or not there perhaps is some basis in the record for the notion that trial counsel should have done more under this constitutional minimum. Let me see if I can better articulate my question. I'd appreciate any help I can get. I don't understand what the case law is saying. The case law says before you can conclude that a strategic decision was a reasonable tactical decision and therefore under Strickland we can't reexamine it, there has to be sufficient enough defense investigation so that a lawyer can make an intelligent choice, an intelligent tactical strategic decision. That's my understanding as well. What I hear Mr. Gerstein arguing is that by definition if no investigation was conducted, then the lawyer could never make a reasonable tactical choice because he or she doesn't know what she's choosing between. So where I need help is in applying Wiggins, where do I draw the line in this case? Your point is every witness that they want to call was called. There might have been more information that they could have mined from the witnesses who testified, but for whatever reason they chose not to go that far. Does that entitle them to a further hearing on remand so that we can figure out what that far was, what evidence was left out that may or may not have been known to Ms. Dell at the time? Well, I think what we can confine ourselves to and what we have to confine ourselves to are the allegations in the petition. When the court suggests that we don't know how far is far enough and we don't know how much more Ms. Dell could have mined or could have discovered if she had done a more thorough or a more diligent investigation, we're allowed, and indeed we're compelled to restrain ourselves to the allegations in the petition. And we can say that that's the absolute maximum that she could have discovered, that the allegations in the petition set the perimeter. And my point is twofold. One is that based upon the case in mitigation that was presented, the additional material that is being proffered is not sufficiently beyond sort of the ambit of that material, which in fact was presented in this case, that we can conclude with any reasonableness that Ms. Dell did a deficient investigation. Almost everything that they're talking about was presented. Let me see if I can restate what I just heard to make sure I understood it. Under prior pre-AEDPA case law, the defense got a hearing by simply saying, we believe that there is evidence in mitigation out there, and here it is, 1, 2, 3, 4, 5, 6, 7. Had it been known, if it's true that this evidence exists, that would have been helpful. We're entitled to a hearing to determine what it was. What I heard you saying is, and I think it's under the AEDPA statute, you have to be more specific now. You don't get a fishing expedition hearing. You've got to come in with the application, and by declarations or some other means, show that you've conducted your own post-conviction, post-sentencing investigation, and here's what you found. And had that evidence been known to trial counsel in advance of the penalty hearing, then it would have been introduced at the penalty hearing, and under BREC, it would have made a difference. Is that what you're saying? That's pretty close, Your Honor. The only caveat I would add is, of course, because we're viewing this under the AEDPA deference lens, we have to set the baseline not at what they can produce now, but at the allegations made to the California Supreme Court. So the fact that they have managed to create an even more substantial case in mitigation in federal court really can't inform the question of whether or not the California Supreme Court's determination of the Strickland question was, I guess in this case, contrary to Strickland or involved in unreasonable application of Strickland, and, of course, Wiggins and the Strickland progeny that we've been discussing today. And also, and I think I'm getting lost in this, and I want to make sure I make this point strongly, there's two prongs to Strickland, of course, and the second prong requires prejudice. But the district court didn't even let them go that far. The district court said, I'm cutting you off on actual conflict under the first prong, and I don't want to hear what you have to say on the second prong. I want to be careful here, Your Honor. I think the court is conflating two different claims. One is the ineffective assistance of counsel at the penalty phase claim, and one is the claim of conflict of interest. And I understand that there's a point of overlap between those two, especially when it comes to the prejudice analysis. But I want to make sure that I'm clear to the court that the IAC claim, which is the one I'm talking about right now, excuse me, that the IAC claim was disposed of by way of summary judgment and was not the subject of an evidentiary hearing. Now, I understand the court might have some concern about whether that was an appropriate determination, but that's a different question than the conflict of interest claim. But getting back to my basic point, which is, we don't have to have a hearing if we can say with confidence that as a matter of law, the allegations in the petition fail to fulfill any, or in this case, either of the necessary predicates to a conclusion that there was ineffective assistance of counsel. And so even assuming, for the sake of argument, that they can show that a reasonable attorney would necessarily have done the additional things and that the failure to do these additional things fell below constitutional minimum, even if we can safely conclude that, we still don't get a hearing. A hearing would not be appropriate unless and until there is the additional showing that had counsel done these things, there is a reasonable probability to believe there would have been a more favorable determination at the penalty phase. And again, this gets us back to the horrifying nature of the crime that occurred in this case. Again, and again, we're not talking about an absent case in mitigation, we're talking about a substantial case in mitigation in which they're going to add a little more weight to that side of the scale. But in this case, the weight on the aggravation side of the scale, particularly the circumstances of the crime, are so overwhelming that it's impossible to conclude, as California agreed, it's impossible to conclude that this additional mitigation would somehow have tipped the scales in the mind of any reasonable juror. Again, there was substantial evidence presented regarding the defendant's home life and the circumstances of his upbringing. And this additional evidence, which is relatively minor and cumulative of that evidence which was previously presented, really adds nothing substantial to the case in mitigation which was presented here. And because we can safely do with the affidavits from, is it two jurors that they obtained who now say, had I known that this evidence was out there, I would not have voted for the death penalty? We ignore them, Your Honor. They're incompetent. Okay. So those cannot be considered to impeach the verdict? Absolutely not, Your Honor. Do you have a case to cite on that? To cite for the notion that a juror's subjective thought process? Can't be used. I would have to refer to my pleadings to bring that to the Court's attention, but I would note that that is not a claim that has been brought in the context of this appeal, Your Honor, that that evidence was competent in any way. It's in the record. Absolutely it's in the record. I found it as well. I was trying to find a case that would question whether or not that could be used. Certainly in California, where I do most of my work, I can state with confidence that the juror's subjective thought process, evidence of that, cannot be presented in any form. Well, I think the federal rule is the same in terms of impeaching verdicts, but where it gets a little fuzzy, and where I was trying to find some cases on my own, where it gets a little fuzzy is in making the Brecht analysis, is it a hypothetical, no reasonable juror would have been swayed, as opposed to a juror who actually served on this case might have been influenced. And here's a declaration from that juror who says, yes, I would have been influenced. Well, the reason that we don't credit juror declarations, Your Honor, is because the myriad forces and influences that might come to bear on that juror that might lead to, and I'm not making any allegation of any wrongdoing on any part. The defense investigator shows up at my doorstep and spends three hours in their living room and then asks them to sign the declaration. Exactly. And that's one of the reasons that we don't accept that evidence is competent on any question. So, no, certainly I don't think that if we were faced with the situation in which there were no declarations of any kind, I don't think this Court would have any trouble applying Brecht v. Abrahamson under those circumstances. So the fact that there are declarations. Other than the problem that we have as judges in trying to apply the standard itself. Yes, but that's a burden for the Court. If I could move on to the question of conflict of interest briefly. The United States Supreme Court has only ever recognized a single conflict of interest, and that is concurrent representation of defendants with divergent interests. Other conflicts of interest may exist. The course of jurisprudence may give rise to other conflicts of interest over time, but Petitioner himself acknowledges on page 45 of his reply brief that no United States Supreme Court case has ever recognized any conflict of interest other than multiple concurrent representation of defendants with conflicting interests. Since that's not the nature of the conflict alleged in this case, California under AEDPA is free to fashion the rules that it finds appropriate. And in this case, if California, as it did in this case, decides in its wisdom that this romantic entanglement doesn't rise to the level of a constitutionally cognizable conflict, that's the end of the inquiry. And unless and until Petitioner can come forward with the United States Supreme Court case that should have compelled California to come to a different result, there's no point in examining this conflict any more closely. That's why when we were in the District Court, and this was, of course, the issue upon which the District Court granted its evidentiary hearing, we were so vigorous that an evidentiary hearing is completely unnecessary because it was our position that even if they could show a florid romantic relationship, that that still is not going to, as in fact was the case, that's not going to rise to the level of a conflict of interest which the United States Supreme Court has ever recognized. And in fact, the United States Supreme Court has said other kinds of conflicts other than multiple concurrent representation have never been recognized by this court. So it's not simply a question of we haven't spoken to the question. We, now I'm on the U.S. Supreme Court apparently, but that the U.S. Supreme Court has never spoken to the question. They have spoken to the question, and they've told us those conflicts don't exist. So it's impossible for a petitioner to maintain a claim of conflict of interest based on a newly created conflict of interest. And that's the reason that we think that not only was the trial court correct in bifurcating the question, which I'll reach in just a moment, but also we think the trial court, or the District Court, excuse me, erred in the first instance by ordering a hearing because the allegations that stated in the petition don't state a cause for relief. On the question of whether or not it was appropriate for the trial court to bifurcate the two questions, there's absolutely two components to a claim of conflict of interest. As a matter of fact, it's exactly the same two components that arise in the context of Strickland v. Washington. In fact, it's Strickland v. Washington that it recognized the conflict of interest as being an alternative basis for a claim of incompetent counsel in the first instance. Although Washington now considers this to be an actual conflict of interest. Excuse me? Washington. The State of Washington? Now considers this that we have had the same problem, and the State Bar has now concluded that that is an actual conflict. And I'm not saying that that's necessarily an unwise determination at the end of the day. The question in this case is whether California was compelled to so conclude based on the State of the United States Supreme Court jurisprudence at the time it was asked to pass upon the question. Certainly there would never be a problem, I can't imagine there would be a problem, if a trial court in a traditional Strickland v. Washington allegation said, we're going to have two different analyses, much like the conversation we've been having today, in which we're going to examine in some detail and discuss with some scrutiny the question of whether counsel should have done something differently or should have omitted some action that they performed. And then upon a conclusion that, affirmative conclusion of that inquiry, we're going to turn our attention to the question of whether or not there was some prejudice that flowed from that deficiency. That's precisely what Judge Reel did in this case. He said there's two components to a Strickland claim of conflict of interest. One is the question of whether there's a conflict of interest. And once we have determined there is a conflict of interest, we're going to turn our attention to see what adverse impact, if any, might have flowed from that conflict. It was tremendously gratifying to me to discover upon my research in this case that these both come out of Strickland v. Washington, because that eliminates in my mind a lot of the ambiguity that some of the subsequent cases might create. In this case, we can say with confidence that it's absolutely appropriate to ask in the first instance whether or not there is a conflict of interest before we're going to turn our attention to the question of whether there was an adverse impact. And the reason that has to be the rule, the reason no other rule can rationally obtain, is because if all we're going to do is skip to the question of prejudice and talk about how prejudice demonstrates conflict, we're going to end up in situations where Petitioners are going to say, well, see here, the prejudice in this case is so overwhelming that we can really just skip over the first problem, or we can have a mitigated showing on the first problem, which is precisely what Petitioner hoped to do in this case. They hoped to present to the district court such a compelling case on the prejudice prong in the inquiry that they could just forego any real showing that there was a cognizable conflict of interest, just real appropriately, properly, reel them back in a little bit. Excuse me. You're not explaining here conflict and mitigation. You mentioned mitigation. You're speaking now in a Strickland sense only about the conflict of interest, I take it. That's the issue I'm addressing right now. Yes, Your Honor. You made a similar argument that we, under Strickland, we can't now come in and offer more. But, you know, as the Wickens case, back to that. Yes, Your Honor. Points out that in a capital case, the capital case is different, and the sentencing is different in a capital case, and therefore mitigating circumstances become extremely important. What should they have alleged in their petition on mitigation that they did not allege? Well, I don't think there is anything, Your Honor, because I don't think there's anything out there. But if you follow the argument of counsel. I don't know that you understood her question. I beg your pardon? I don't know that you understood her question. Perhaps I did not. What she's saying to you is what should they have alleged, and I gather your answer would be they should have alleged what they would have found had they searched. Thank you, Your Honor. I guess I did misunderstand the question. That's absolutely correct. For example, this neuropsychological evidence that Mr. Gerstein was discussing. I'd like to see an allegation, an affirmative allegation. Mr. Earp suffers from the following neuropsychological deficit, and then identify it with specificity. Not trial counsel should have done a better job investigating the arena of neuropsychology and the applicability of neuropsychology. Now we have to have a more specific allegation. Otherwise, we're in a position, and especially, again, since we're dealing with EDPA deference, we're in a situation where they can make very vague allegations to California. They can make these allegations that he may have, he has certain features that might be consistent with neuropsychological deficits. California would say, well, that doesn't allege that he has such a thing. We're not going to find that mitigating. Then he comes to federal court and makes the same vague allegations, but if an evidentiary hearing is compelled at that point, he brings in very specific evidence. It's going to render the claim unexhausted because that's going to substantially transform the claim. That's what we can't do. We cannot have a situation where the allegations to California are somehow so greatly enhanced that they transform a vague, weak, unsustainable claim into a solid, sustainable claim. And the problem that we have here is that under EDPA, they're married to what they said to California in order to say that the district court erred. And unless the court has further questions, I'll forego my last 40 seconds. I have nothing further. Thank you, Your Honor. Mr. Gerstein, I'll give you a few more minutes. Thank you, Your Honor. Mr. Gerstein, from my perspective, this is important that you answer what opposing counsel just stated. Yes, Your Honor. Well, there were certainly allegations relating to the fact that the school records showed some neuropsychological deficit. There was that gap in the IQ test that was specifically alleged. The that he had a head injury that that we allege resulted in psychological neurological problems. That is specifically alleged that there was early drug use that result in those problems. That was specifically alleged. What was added at the federal level was simply further development of those allegations. But I believe your honors will find those allegations in the in the petition. If runners wish, we could brief further on that more specifically. Now that it's been raised, let me just ask you a simple factual question. Was he examined by the neuropsychologist? Was some kind of a brain scan done? He was examined. There were and there were psychological tests done. And this all would have been obviously post conviction. Yes. Yes. Yes. Post conviction. And of course, post penalty phase in the in the habeas process. Difficult. Judge Nelson mentioned a case that you haven't read it because we stayed the mandate. But in that case, they did specify what could have been discovered. The death of the father, the beatings of the boy, the effect of those things. And none of that was offered in mitigation. And the court, and I think properly, unless we get convinced otherwise, decided it should have been introduced. And the suggestion here is we don't know from this record what the facts are. He's suggesting that you're asking us to order a fishing expedition. And now everything that can be discovered. Now is the time to tell us what she would have discovered had she done what you think she should have done. And if we have that in the record, then according to the prosecution, we've got something to decide. If we don't have it, then according to the prosecution, we don't have anything to decide. And that's what I think Judge Nelson is asking you to answer. Yes. And that's what I'm listening to. Get the end. I think we've developed that, Your Honor. There there was no evidence presented and no investigation done for the purpose of determining whether Mr. Earp had any mental, psychological disabilities or deficit. It would have been discovered that it would have been discovered as the expert declaration shows that. And this could have been found following up leads from the from the school records. It could have been found by following up on finding out about all this very serious early drug use. He does show the signs in the tests of brain damage, which would result in what the expert called a diminution of executive functions, which means impaired judgment and impaired capacity to control behavior. And that that's not a fishing expedition. Your Honor, that is, I understand it's not anybody would know just from this crime. The person who committed it would have just what you described. Well, otherwise he couldn't have committed it. Not to an 18 month old child. Yes. You're on the minds and rape a baby unless you lack control. Yes. Your Honor. How would that how would that have changed anything? Your Honor. Showing demonstrating to a jury that some of that lack of control, perhaps all of that lack of control resulted from some injury. But some deficit. We have it in this record that that has been demonstrated. Your Honor, we have it in the declaration. Now, of course, we can't say absolutely demonstrated. Of course, at an evidentiary hearing, that evidence would be put on. It could be challenged. We can't say it definitively, but we have alleged it and we have presented supporting evidence for it. And that is our contention. That's the basis for an evidentiary hearing at which it will be possible to demonstrate that. And surely if that were demonstrated, then it is reasonably probable that at least one juror. And that's all it takes. As Wiggins said, as this court said in Mayfield, as this court said in Boyd, one juror at least might have been influenced to come to a different conclusion. Exactly. Mr. Garcia, thank you. The case, as argued, is submitted. And we'll get to our answer as soon as we can. Thank you very much. The court for this session stands adjourned.
judges: Farris, D.W. Nelson, Tallman